# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

        Plaintiff,

    vs.                                        No. CR 06-607 MCA

**ISRAEL MUNOZ-TELLO**,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court for sentencing following the acceptance of Defendant Israel Munoz-Tello's plea of guilty to Counts 4, 5, 6, and 7 of the *Indictment*, which charged him with Transporting an Illegal Alien Resulting in Death, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(B)(iv), and Aiding and Abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(II). The Court held a sentencing hearing in Albuquerque, New Mexico, on November 29, 2006, at which Defendant and counsel were present. Having fully considered the parties' submissions, the pre-sentence report and addendum thereto, the applicable law, the evidence and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court imposes a term of imprisonment of 96 months for the reasons set forth at the hearing on November 29, 2006, which are further documented below.

On July 27, 2006, Defendant Israel Munoz-Tello pleaded guilty to Counts 4, 5, 6, and 7 of the *Indictment*, which charged him with Transporting an Illegal Alien Resulting in Death, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(B)(iv), and Aiding and Abetting, in violation of 8 U.SC. § 1324(a)(1)(A)(v)(II).  These charges arise from Defendant's transportation of eleven illegal aliens in an overloaded and overcrowded 1997 Chevrolet Suburban on a cross-country trip from Phoenix, Arizona to Atlanta, Georgia.  As Defendant and his passengers passed through the Santa Fe, New Mexico area during their trip, the Suburban rolled over in a single-vehicle accident, and four of the passengers were killed.  Five of the other passengers sustained serious injuries requiring lengthy hospital treatment.  Defendant also was injured in the crash, and the two remaining passengers received minor injuries.

The parties' sentencing briefs, as well as their arguments at the sentencing hearing, focus on four issues:  (1) whether the guideline calculation in the pre-sentence report (PSR) correctly increases the offense level to 18 based on the application of U.S.S.G. § 2L1.1(b)(5); (2) whether the framework for upward departures articulated in the Sentencing Guidelines, including U.S.S.G. § 5K2.1, allows for a five-level upward departure to a sentence of eight years (or 96 months) based on the multiple victims who died or suffered serious injuries as a result of Defendant's conduct; (3) whether such an upward departure to a sentence of eight years (or 96 months) accords with the post-Booker framework for evaluating the reasonableness of a sentence, including the factors articulated in 18 U.S.C. § 3553(a); and (4) whether any downward variance from the Guideline imprisonment range is warranted.

-2-

I.    **Guideline Calculation for Specific Offense Characteristic under § 2L1.1(b)(5)**

Applying the 2005 edition of the Guideline Manual, the PSR calculates the Defendant's base offense level as 12, provides a three-level reduction for acceptance of responsibility, and then increases the offense level based on the following specific offense characteristics and guideline provisions:

| Guideline | Specific Offense Characteristic | Increase in Offense Level |
|---|---|---|
| U.S.S.G. § 2L1.1(b)(2)(A) | Transporting between 6 and 24 illegal aliens | 3 |
| U.S.S.G. § 2L1.1(b)(5) | Recklessly creating substantial risk of death or serious bodily injury to another person | 3 (to level 18) |
| U.S.S.G. § 2L1.1(b)(6)(4) | Death of "any person" | 8 |

With these three increases and the reduction for acceptance of responsibility, the total offense level is 23. The PSR indicates a criminal history category of I, resulting in a Guideline imprisonment range of 46 to 57 months.

Defendant asserts that the PSR's Guideline calculation errs by including the three-level increase (to a level of at least 18) for recklessly creating a substantial risk of death or serious bodily injury to another person under U.S.S.G. § 2L1.1(b)(5). To support this assertion, Defendant relies primarily on two reported cases which held that it was improper to increase a defendant's offense level based on this specific offense characteristic. See United States v. Aranda-Flores, 450 F.3d 1141, 1146 (10th Cir. 2006); United States v. Solis-Garcia, 420 F.3d 511, 516 (5th Cir. 2005). Defendant also presented evidence at the

-3-

sentencing hearing to show that the vehicle at issue here was equipped with three seat belts for passengers in the middle row of the vehicle.

However, according to the testimony of Deputy Ritch, who arrived at the scene of the rollover shortly after it occurred, the middle-row seat belts were present, but the lap belts were tucked behind the seat such that they could not be accessed or used by the passengers. I accept this testimony as credible, and I do not credit the testimony of the defense investigator as to the condition of the middle row she observed some nine (9) months after the incident. It is undisputed that the front and rear seats had seat belts, but the evidence indicates that none of the occupants except Defendant was wearing a seat belt at the time of the rollover.

I conclude that the PSR's Guideline Calculation for Specific Offense Characteristic Under § 2L1.1(b)(5) of the Sentencing Guidelines is correct, and therefore Defendant's objection is overruled. This case is factually distinguishable from Aranda-Flores and Solis-Garcia in several respects. Unlike the vehicle at issue in Aranda-Flores, the facts recited in the PSR indicate that the 1997 Chevrolet Suburban driven by the Defendant at the time of the rollover was substantially overloaded and overcrowded, as it contained a total of twelve occupants instead of the eight occupants (including the driver) the vehicle was designed to safely carry.

These facts significantly decreased the safety of the occupants in Defendant's vehicle. Even accounting for the three seat belts in the middle row, there were still not enough seats or seat belts for all the vehicle's occupants. Defendant placed two of the passengers in the

-4-

rear cargo area, where there were no seats or seat belts at all.  And with two passengers seated in the front and two passengers placed in the rear cargo area, the remaining eight passengers had to be crowded four to a row in the middle and rear seats, which were designed to safely accommodate only three to a row.  It is also likely that the overloading of the vehicle adversely affected its handling or maneuverability, thereby making it more prone to get in an accident and more likely that the occupants would be killed or injured if and when an accident occurred.

The duration of the Defendant's journey and his time behind the wheel before the accident also make this case factually distinguishable from Solis-Garcia.  The facts recited in the PSR indicate that Defendant was driving the 1997 Chevrolet Suburban on a cross-country journey from Phoenix, Arizona to Atlanta, Georgia, and that Defendant had been driving the vehicle for more than ten hours at the time of the accident.  The length of this journey and the amount of time Defendant was spending behind the wheel increased the duration of the risk to the occupants.  Defendant knew that they would be exposed to the problems stemming from the vehicle's overloading and overcrowding for a longer period of time than Ms. Solis's shorter intrastate journey to Houston, and that there would be more opportunities for Defendant's vehicle to crash as it encountered a greater variety of road, weather, and traffic conditions during the planned cross-country journey.

If taken in isolation, the duration of the Defendant's journey and the amount of time he spent behind the wheel on the date of the rollover would not constitute recklessness.  See Aranda-Flores, 450 F.3d at 1145-46.  But these facts make for a deadly combination when

added together with the overcrowding and overloading of the vehicle, the lack of seat belts for some of the occupants, and the placement of two of the occupants in the vehicle's rear cargo area where there were no seats or seat belts.  Defendant knew of and was instrumental in creating this deadly combination of facts, and he was reckless in doing so.

## II.   Upward Departure for Multiple Deaths and Injuries Under U.S.S.G. § 5K2.1

The next area of contention in the parties' sentencing briefs is whether the facts of this case provide grounds for an upward departure based on the framework set forth in the Sentencing Guidelines.   In contrast to the sentencing enhancement under U.S.S.G. § 2L1.1(b)(5), which is based on Defendant's ***conduct***,   the grounds for upward departure asserted here arise from the ***outcome***, namely the deaths of four of Defendant's passengers and the serious injuries to several other passengers.

As to the seriousness of the injuries, I note the uncontroverted testimony at the sentencing hearing that one of the juvenile passengers had his leg amputated as he was thrown from the vehicle during the crash.  When responding to the scene of the accident, Deputy Ritch found this victim trying to crawl off the roadway several yards from the resting point of the rolled vehicle.   A second juvenile passenger who was interviewed by police after the accident had a fractured jaw that was wired shut, as well as severe head trauma that required surgery on the back of his head.  This victim is still undergoing physical therapy in California.   A third juvenile spent three to four weeks in the hospital before being sent home, and a fourth victim remains in a comatose or vegetative state.

Recognizing the advisory nature of the Sentencing Guidelines, I conclude that a five-level upward departure for multiple deaths and injuries based on § 5K2.1 of the Guidelines and the methodology articulated in United States v. Jose-Gonzalez, 291 F.3d 697, 703 (10th Cir. 2002), is warranted in this case.  The large number of deaths and serious injuries in this case take it out of the heartland and make it more appropriate to apply a different grouping rule than would otherwise apply in the Guideline calculations.

The grouping rule found in U.S.S.G. § 3D1.2(d) ordinarily requires all the counts of transporting illegal aliens to be combined together in one unit for purposes of calculating a Guideline sentence.  See Jose-Gonzalez, 291 F.3d at 705.  The rationale for combining separate counts of transporting illegal aliens into a single group for Guideline calculation purposes is that immigration offenses "covered by § 2L1.1 . . . share the same single victim-- the societal interest in controlling immigration."  Id. at 707.  The PSR's initial Guideline calculation in the case at bar takes this approach by grouping all of the counts to which Defendant pleaded guilty and calculating a single offense level and corresponding Guideline sentencing range for the group as a whole.

For purposes of calculating an upward departure based on multiple deaths or injuries, Jose-Gonzalez authorizes district courts to borrow or analogize from a different grouping rule in the Sentencing Guidelines, because the "single victim" rationale behind U.S.S.G. § 3D1.2(d) no longer applies.  "When . . . the gist of the offense is injury [or death] to persons, the offense against each human victim belongs in a different group, even when the offenses arise out of a single event."  Id.  Accounting for the offense against each human victim in this

-7-

manner "reflects concern for human safety as much as concern for immigration policy." Id.
"[T]he Guidelines commitment not to group offenses having different human victims" not
only tolerates but encourages such a "logical extrapolation" of the grouping rules in the
factual scenario presented here. Id.

In particular, the application of the Jose-Gonzalez methodology to U.S.S.G. § 3D1.4
would allow for at least a four-level increase corresponding to each of the deceased victims
named in Counts 4 through 7 of the *Indictment*, where each of these deceased victims is
counted as one unit under § 3D1.4.  In addition, the Jose-Gonzalez methodology allows the
Court to take into account the seriously injured victims even if they are not named in separate
counts in the *Indictment* which are the subject of a guilty plea.  Here the facts recited in the
PSR indicate that there were at least five injured victims who required hospital treatment, and
at least the two of these injured victims were airlifted to UNM Hospital due to the
seriousness of their injuries.  As noted above, some of these injuries were particularly severe,
resulting in loss of a limb for one victim and, in the case of another, a comatose or vegetative
state which persists to this day.

Counting at least two of these seriously injured victims as two additional units under
§ 3D1.4, the application of the Jose-Gonzalez methodology allows for the maximum five-
level increase, because there is a total of more than five units when the two units
corresponding to the injured victims are added to the four units corresponding to the

deceased victims.  With a criminal history category I, a five-level increase from offense level 23 to offense level 28 would result in a Guideline imprisonment range of 78 to 97 months.

The Government has requested a sentence of 96 months, and Defendant received notice and opportunity to respond to this request before the sentencing hearing.  I determine that a sentence of 96 months is appropriate under the Guidelines framework for upward departures and the Jose-Gonzalez methodology.

## III.   **Reconciling an Upward Departure with Post-*Booker* Factors**

Before applying an upward departure based on the pre-Booker Guideline framework articulated above, the Court must acknowledge that the Guidelines are now only advisory and, therefore, it is necessary to reconcile the result of the Court's application of that framework with post-Booker factors.  For the following reasons, I conclude that a five-level upward departure under the Jose-Gonzalez methodology and § 5K2.1 of the Guidelines is consistent with the sentencing factors articulated in 18 U.S.C. § 3553(a) as well as other factors identified in post-Booker case law for evaluating the reasonableness of Defendant's sentence.

Using the method of calculation set forth in United States v. Valtierra-Rojas, No. 05-3390, 2006 WL 3237187, slip. op. at 7 (10th Cir. Nov. 9, 2006), there is a divergence of approximately 68% between the high end of the initial Guideline imprisonment range (57 months) and the actual sentence (96 months) requested by the Government in this case.  There is a difference of 39 months between this actual requested sentence and the high end of the initial Guideline imprisonment range.  I assume for purposes of analysis that such a

divergence would be considered "substantial" but not "extreme" under the Valtierra-Rojas formula.  Thus, the 96-month sentence proposed here requires "compelling reasons" to support it.  Id.

Such compelling reasons appear in prior cases where sentencing courts applied the pre-Booker Guidelines framework and methodology for upward departures to similar situations.  See, e.g., Jose-Gonzalez, 291 F.3d at 708; Aranda-Flores, 450 F.3d at 1143. They also appear in post-Booker authorities.  See, e.g., United States v. Zunie, 444 F.3d 1230, 1237 (10th Cir. 2006) (affirming upward departures based on the Guideline's failure to account for the amount of damage and loss and the serious physical injuries to the victims, and concluding that upward departures on these grounds accord with other factors "such as the seriousness of the offense and the need for just punishment and deterrence").

In particular,  Jose-Gonzalez  amplifies a rationale that is already set forth in the commentary to the Guidelines, namely that it makes sense to alter the Guidelines' grouping rules by creating separate units for each of the multiple human victims who died or were seriously injured during the commission of the offense at issue here, even if this approach relies on "pseudo counts" that do not correspond to the *Indictment* or to the way the actual counts were grouped in the initial Guideline calculation that preceded the upward departure calculation.

One of the primary purposes for treating the multiple victims as separate units when calculating an upward departure in this context is to ensure that the resulting sentence reflects concern for human safety as well as concern for federal immigration policy.  See

-10-

Jose-Gonzalez, 291 F.3d at 707. Accounting for human-safety concerns and giving due regard to each of the human lives that were adversely affected during the commission of the offense is consistent with the sentencing goals articulated in 18 U.S.C. § 3553(a). In particular, the number of victims who died or were seriously injured are important components of "the nature and circumstances of the offense" which increase "the seriousness of the offense." Id. The serious nature and circumstances of the offense in turn must be considered in crafting a sentence that promotes "respect for the law," provides "just punishment for the offense," affords "adequate deterrence to criminal conduct," and protects "the public from further crimes of the defendant." Id.

    In particular, the 96-month sentence imposed here serves as an important deterrent to future criminal conduct of this nature. Putting transporters of illegal aliens on notice that they will face a higher sentence if such fatal consequences result from their unlawful activities is one important way that the Government can induce them to exercise greater care in selecting and loading a vehicle, ensuring adequate safety equipment for each of their passengers, and scheduling an appropriate number of rest stops and driver changes during their journeys. In addition, the prospect of such higher sentences makes it more difficult for those engaged in the people-smuggling business to hire drivers to transport their human cargo, thereby impeding their criminal enterprise.

    This deterrence rationale applies with special force to the history and characteristics of the Defendant in this case, because the PSR indicates that he has entered the United States illegally in the company of other illegal aliens on eleven prior occasions. The last three of

these occasions involved circumstances where Defendant was identified as the driver of vehicles transporting illegal aliens into the United States.  Given this history, an upward departure to a sentence of 96 months serves to protect "the public from further crimes of the defendant."  18 U.S.C. § 3553(a); see Valtierra-Rojas, No. 05-3390, slip. op. at 11-15.

In suggesting an upward departure based in part on this deterrence rationale, I do not mean to imply that Defendant's record of prior deportations while driving a vehicle transporting illegal aliens makes him guilty of other felony offenses or serves to raise his criminal history to a higher category for sentencing purposes.  The upward departure contemplated here does not depend on finding an under-representation of Defendant's criminal history or finding that he acted with excessive recklessness or *mens rea* beyond that contemplated in U.S.S.G. § 2L1.1(b)(5).

Instead, it is the outcome or consequences of Defendant's criminal behavior that provides the basis for an upward departure in this case.  Sentencing "[d]istinctions based on the consequences of a criminal act, as opposed to the intentions of the actor, represent an enduring and pervasive characteristic of the moral thought that informs our system of criminal law."  United States v. Tham, 118 F.3d 1501, 1507 (11th Cir. 1997).   Such distinctions are appropriate under both the Sentencing Guidelines and the other factors articulated in 18 U.S.C. § 3553(a).

Respect for the law requires a sentencing court to reaffirm the sanctity of each human life that is victimized by the commission of a serious felony.  This goal is not achieved by lumping multiple deceased and seriously injured victims together in a single group for

-12-

sentencing purposes, especially where such a grouping only addresses societal concerns about immigration policy and does not address the more basic need for human safety.

For sentencing purposes in this case, it does not matter if the victims who died or were seriously injured during the commission of Defendant's crime were themselves guilty of entering the United States illegally.  Cf. Tham, 118 F.3d at 1509-10 (reasoning that the rationale underlying the felony-murder rule applies regardless of whether the deceased was a victim or participant in the crime).  Regardless of their citizenship, all are human beings entitled to equal protection under the law.  The law values each of their lives regardless of where they came from or whether they have family members or other advocates to represent their interests before the Court.

As a result of the rollover accident in this case, Libiardo Salvador-Gomez died at the age of 15.  Rogelio Pedraza-Valdez died at the age of 18.  Javier Cruz-Urbina died at the age of 26.  Martin Pedraza-Vega died at the age of 32.  Juliana Garcia and Jose-Antonia Garcia-Mondragon, both age 15, were airlifted from the accident scene to UNM Hospital due to the extent of their injuries.  There were three more passengers whose injuries required admission to St. Vincent Hospital in Santa Fe:  Javier Cruz-Franco, age 17; Jorge Guzman-Meza, age 31; and Gabriel Garcia, age 38.  These were all young people with their lives ahead of them when they found themselves tumbling in an overloaded vehicle without the protection of seat belts during a cross-country journey led by Defendant Israel Munoz-Tello.

For all of the above reasons, both the Guidelines framework for upward departures and the additional factors the Court is required to consider under Booker and its progeny

-13-

support the Court's decision to impose a prison sentence of 96 months in this case. The Government's motion for an upward departure is, therefore, granted.

## IV. **Defendant's request for a downward variance.**

In addition to his objections to the Guideline calculation and upward departure, Defendant asserts that the Court should make a downward departure or variance from the applicable Guideline sentence because of his family ties and responsibilities. The Court also has received a number of letters attesting to his good character that were submitted on Defendant's behalf by his friends and family members. In addition, Defendant points out that he has no record of criminal history during his prior trips to the United States, that he agreed to speak with law enforcement officers at an early point in their investigation of the accident, and that he entered into a plea agreement as soon as it was possible for him to do so.

I find that these factors are already taken into account to a sufficient degree in the PSR's initial Guideline calculation. As noted above, Defendant is given a three-point reduction in his offense level for acceptance of responsibility, and he is placed in a criminal-history category of I. These Guideline calculations result in a significantly lower sentence than Defendant would receive if he had not accepted responsibility or if he had a significant prior criminal record in the United States. Accordingly, a downward departure or variance on the grounds requested by Defendant is not warranted in this case.

-14-

**IT IS THEREFORE ORDERED** that Defendant Israel Munoz-Tello is sentenced to a term of imprisonment of 96 months with the additional conditions stated at the sentencing hearing; judgment shall be entered accordingly.

**SO ORDERED** this 11th day of December, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge